COLORADO RIVER WATER CONSER-
VATION DISTRICT,
Plaintiff-Appellant,

v.

UNITED STATES of America, Rogers C.
B. Morton, Secretary of the Interior,
Gilbert R. Stamm, Commissioner of the
Bureau of Reclamation, James M. In-
gles, Regional Director, Lower Missouri
Regional Bureau of Reclamation, North-
ern Colorado Water Conservancy Dis-
trict, and Municipal Subdistrict-North-
ern Colorado Water Conservancy Dis-
trict, Defendants-Appellees,

and

City and County of Denver, Board of
Water Commissioners, the City of Auro-
ra and the City of Colorado Springs,
Intervenors-Appellees.

No. 76–1383.

United States Court of Appeals,
Tenth Circuit.

Submitted May 18, 1977.

Decided July 18, 1977.

Scott Balcomb of Delaney & Balcomb, Glenwood Springs, Colo., for plaintiff-appellant.

Carl Strass, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., James L. Treece, U. S. Atty., Hank Meshorer, Senior Trial Atty., U. S. Dept. of Justice, Denver, Colo., and Edmund B. Clark and Peter R. Steenland, Jr., U. S. Dept. of Justice, Washington, D. C., on brief), for Federal defendants-appellees.

John M. Sayre, Denver, Colo. (Donald E. Phillipson and Robert V. Trout, Denver, Colo., on brief), of Davis, Graham & Stubbs, Denver, Colo., for defendants-appellees Northern Colo. Water Conservancy Dist. and Municipal Subdistrict, Northern Colo. Water Conservancy Dist.

George L. Zoellner, Aurora, Colo., and Michael L. Walker, Denver, Colo., for intervenors-appellees.

Before McWILLIAMS, BARRETT, Circuit Judges, and BOHANON,* District Judge.

BARRETT, Circuit Judge.

Colorado River Water Conservation District (CRWCD) appeals from a summary judgment granted in favor of Northern Colorado Water Conservancy District (Northern District), Municipal Subdistrict, Northern Colorado Water Conservancy District (Subdistrict) and the United States (hereinafter collectively referred to as Defendants) denying CRWCD's prayer for an injunction. Upon review, we are guided by the rule that a motion for summary judgment should be granted only when the moving party has established the absence of any genuine issue as to a material fact. *Dzentis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168 (10th Cir. 1974); *James v. Atchison, Topeka & Santa Fe,* 464 F.2d 173 (10th Cir. 1972).

CRWCD alleges that the Defendants violated the Administrative Procedure Act, 5 U.S.C. §§ 552, 553, 555 (APA); the National Environmental Policy Act, 42 U.S.C. § 4321, et seq., (NEPA); the Colorado River Storage and Project and Participating Projects Act; and a Decree in Civil Actions Nos. 2782, 5016 and 5017.

In March 1972 CRWCD learned that Defendants were discussing a contract whereby the United States would carry water for Subdistrict from the Western Slope of Colorado to the Eastern Slope of Colorado through the surplus capacity of the completed Colorado—Big Thompson Project. CRWCD filed objections to these contract proceedings and requested that it be permitted to participate in the negotiations. James M. Ingles (Ingles), Regional Director of the Lower Missouri Regional Bureau of Reclamation, replied that the discussions were simply informal and that CRWCD would be allowed to participate in the negotiations. On April 28, 1972, CRWCD repeated its request to participate in the negotiations. Although it is disputed, Ingles contends that he orally told CRWCD that negotiations were in progress. On August 28, the first draft of the water contract was completed. On September 11, 1972, CRWCD again made its request to participate in the negotiations and outlined its concerns relative to the contemplated action. Shortly thereafter, the United States said that it was processing CRWCD's requests. CRWCD reiterated its concerns and asked to orally discuss them. On November 10, 1972, CRWCD received a letter from the Bureau of Reclamation stating that negotiations were occurring; it outlined the main context of the proposed contract. CRWCD replied that it wished to appear in the negotiations.

On March 29, 1973, CRWCD received a final draft of the proposed contract. In June, the Bureau of Reclamation prepared a "Negative Determination of Environmental Impact" wherein it limited considerations to the impact of the proposal on the Colorado—Big Thompson facilities and the operations thereof.

The contract was executed on October 3, 1973, before CRWCD had commented on it. The contract provided that the surplus capacity of the Colorado—Big Thompson facilities could be used to transport water for the Subdistrict, if the Subdistrict could obtain the necessary water rights and that:

. . . The United States will not transport Subdistrict water through the Colorado—Big Thompson conveyance system under this contract until the Subdistrict has provided its environmental assessment report, as specified herein, and the Final Environmental Statement has

* Senior Judge, Oklahoma, sitting by designation.

been processed in accordance with established National Environmental Policy Act compliance procedures, and the use of the Project works is thereafter approved by the Secretary, it being the intent of the parties hereto that such approval is to be based on environmental considerations only. [R., Vol. I, Supp., Ex. A, p. 14.]

CRWCD contends that the trial court erred in granting the summary judgment because (1) it ignored the purposes of NEPA and allowed the Defendants to engage in a "Major Federal Action" without procedural compliance with said Act, and (2) Ingles' activities violated § 555 of the APA in that CRWCD, as an interested party, was entitled to participate in the negotiations leading up to the contract of October 3, 1973, or to receive prompt notice of the denial of its request to participate.

## I.

CRWCD contends that the October 3, 1973, contract required an environmental impact statement in compliance with the National Environmental Policy Act of 1969 (42 U.S.C.A. § 4332) prior to its consideration and execution.

The contract provides that the surplus capacity of the Colorado—Big Thompson facilities could be used to transport the water for the Subdistrict. It specifically provides that it is contingent upon prior approval of a NEPA statement by the Secretary of the Interior. Before execution of the contract the Bureau of Reclamation promulgated a "Negative Determination of Environmental Impact." This "Determination" was limited to considerations of the use of the Colorado—Big Thompson facilities. It determined that a NEPA statement was not required before the contract was signed but that "Any project plan developed as a result of signing the contract would be required to comply fully with NEPA." [R., Vol. I, Supp., p. 32.]

The trial court found that the October 3, 1973, contract was merely an agreement to enter into an agreement in the future, [R., Vol. I, p. 42.] and that the time was not then ripe for the promulgation of an E.I.S. (Environmental Impact Statement).

NEPA provides in part that:

The Congress authorizes and directs that, to the fullest extent possible: . . (2) all agencies of the Federal Government shall . . .

(c) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on— . . . 42 U.S. C.A. § 4332.

If the contract constitutes a "major Federal action" then, of course, a NEPA statement should have been promulgated prior to its execution. If, on the other hand, the contract does not constitute a major Federal action because it is simply an agreement that precipitated the *planning* for the transcontinental diversion of the subject water, then a NEPA statement is not required. To be sure, there is no question that the transcontinental diversion of water is a major Federal action that will require an environmental impact statement. The contract itself recognizes and acknowledges this fact. The main issue, then, is whether the environmental impact statement was required before October 3, 1973, when the contract was signed.

The trial court determined that on October 3, 1973, the time was not ripe for the environmental impact statement. The agency determined likewise in its "Negative Determination of Environmental Impact" assessment. We agree.

The "rational basis" test, under which the court will reverse an agency's decision, applies if the decision has no warrant in the record and if there is no reasonable basis in the law. This test is applicable in determining whether the time is ripe for a NEPA statement. *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974); *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 156 U.S.App. D.C. 395, 481 F.2d 1079 (1973). Applying this test, we hold that the trial court's grant of summary judgment must stand. The

record evidences that Subdistrict has not obtained the water to be carried. On that predicate, there cannot be a definite determination of the environmental impact on the area the water is to be transferred from. Again, the contract expressly recognizes that a NEPA statement must be prepared and approved. The stage of the proceedings we consider here is very similar to that considered by the Department of Commerce in *Upper Pecos Association v. Stans*, 452 F.2d 1233 (10th Cir. 1972), vacated and remanded to determine mootness, 409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972). The project there contemplated was not definitely defined and:

> . . . Certainly the project must be of sufficient definiteness before an evaluation of its environmental impact can be made and alternatives proposed. 452 F.2d, at 1237.

Nor do we have a "reversible commitment" such as that considered in *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission, supra,* because, in the instant case, if an environmental statement is not approved the federal facilities are not to be committed.

The procedure employed here leading to and including the contract execution does not involve major Federal actions under NEPA. In *Aberdeen & Rockfish Railroad Co. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the Court stated that a NEPA statement must be prepared only when an agency makes a recommendation or report on a proposed major Federal action. The Court observed:

> NEPA provides that "such statement . . . shall accompany *the proposal* through the existing agency review processes" (emphasis added). . . . It simply says what must be done with the "statement" once it is prepared—it must accompany the "proposal." The "statement" referred to is the one required to be included "in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment" and is apparently the final

impact statement, for no other kind of statement is mentioned in the statute. *Under this sentence of the statute, the time at which the agency must prepare the final "statement" is the time at which it makes a recommendation or report on a proposal for federal action* (emphasis added). 422 U.S., at p. 320, 95 S.Ct. at p. 2356.

*See also*: *Kleppe v. Sierra Club, et al.,* (427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576, United States Supreme Court, June 28, 1976). Here, the proposal for the transcontinental diversion is yet "on-going" through the agency review processes. The agency cannot recommend the proposal *until* the NEPA statement has been approved.

In a practical sense, it would be overly burdensome to require an agency to prepare a NEPA statement before the plans for the proposal are prepared.

## II.

CRWCD contends that 5 U.S.C.A. § 555, the Administrative Procedure Act (APA), was violated by the Defendants in that CRWCD, as an interested party, was entitled either to participate in the negotiations leading to the contract execution on October 3, 1973, or to receive prompt notice of the denial of its request to participate.

CRWCD asserts that the Bureau of Reclamation's duties are *inter alia*:

> (b) . . . So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. . . .

> (e) Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement on the grounds for denial. 5 U.S.C.A. § 555.

CRWCD argues that the Bureau of Reclamation was required to allow it to participate in the negotiations after it had so requested some five distinct times. CRWCD does not acknowledge, however, that it received a draft of a proposed contract six months before it was signed, and that during that period it did not request to comment orally relative to the contract nor did it submit written comments on the proposal.

We agree with this language from *Easton Utilities Commission v. Atomic Energy Commission*, 137 U.S.App.D.C. 359, 424 F.2d 847 (1970):

> . . . We do not believe that the affirmative grant of a right to appear is blindly absolute, without regard to time of appearance, the status of the proceedings, the administrative avenues established by other statutes and agency rules for participation, or, most importantly, as "the orderly conduct of public business permits."

Our consideration of the procedure pursued in the instant case leads us to conclude that the APA was not violated. CRWCD did not exercise its opportunity to comment on the contract, even though the Bureau of Reclamation afforded it such opportunity. True, CRWCD did submit its requests at different times than the authorization from the Bureau of Reclamation. However, it is settled that the administrative agency may determine the appropriate time. In any event, the proceedings were so preliminary at the times CRWCD contends that it should have been permitted to appear that its presence may have been more disruptive than beneficial.

WE AFFIRM.